119 F.Supp.2d 943 (2000)
Maureen KOVACH, Plaintiff,
v.
Kenneth APFEL, Commissioner of Social Security, Defendant.
No. 2:99CV0052 (MLM).
United States District Court, E.D. Missouri, Northern Division.
September 28, 2000.
*944 *945 *946 Karen Kraus Bill, Law Office of Karen Kraus Bill, Columbia, MO, for Maureen M. Kovach, plaintiff.
Edward L. Dowd, Jr., Nicholas P. Llewellyn, Office of U.S. Attorney, St. Louis, MO, for Kenneth Apfel, Social Sec. Admin., defendant.

MEMORANDUM AND ORDER
MEDLER, United States Magistrate Judge.
This is an action under Title 42 U.S.C. § 405(g) for judicial review of defendant Kenneth Apfel's ("Defendant") final decision denying plaintiff Maureen Kovach's ("Plaintiff") application for Social Security benefits under Title II of the Social Security Act. Plaintiff has filed a brief in support of her Complaint. [26] Defendant has filed a brief in support of his Answer. [31] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[13]

I.

PROCEDURAL HISTORY
On October 24, 1995, Plaintiff filed an application for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401, et seq. (Tr. 110-112), alleging a disability beginning September 30, 1993, by reason of multiple back injuries, chronic headaches, sciatic nerve pain and pain in her left abdominal quadrant. (Tr. 140). The application was denied initially (Tr. 105-109) and upon reconsideration. (Tr. 98-102).
Plaintiff requested a hearing (Tr. 97) which was held on July 11, 1996, before Administrative Law Judge ("ALJ") James Seiler. (Tr. 44-65). Judge Seiler determined that Plaintiff was not under a disability at any time through the date of his decision. (Tr. 321-325). Plaintiff then appealed the decision to the Appeals Council. (Tr. 331). The Council remanded for further consideration. (Tr. 335-338). The Appeals Council remanded the case for the following reasons:
# Records not before the Administrative Law Judge were submitted in connection with the request for review which show that claimant was admitted to the Audrain Medical Center in Mexico, Missouri, in February 1997 after a possible suicide attempt. She was initially on precautions for her own safety and discharged with a diagnoses including bipolar, somatization and personality disorders and a Global Assessment of Functioning (GAF) of 45 (current) and 55 (past year). The record also shows that the [claimant] has had psychiatric treatment or been referred to psychiatric treatment by medical professionals since 1992 ....
# The new evidence shows that the claimant denied alcohol and tobacco abuse to Daniel Scodary, M.D. in October *947 1996, but reported a history of drug and alcohol abuse to the Audrain Medical Center. The record shows a history of reference to drug and alcohol abuse ....
# The residual functional capacity found for the claimant by the Administrative Law Judge was found not to preclude her past relevant work as a receptionist in 1987 and 1988. However, it was also found that the claimant's non-exertional limitations would result in "moderate" difficulties in maintaining social functioning on the "Psychiatric Review Technique Form" attached to the decision. The claimant described some of her duties as a receptionist as answering phones, setting appointments and greeting patients .... The Appeals Council concludes that further evaluation of the claimant's mental impairment is necessary to determine whether the claimant can return to her past relevant work.
(Tr. 336-337). On remand, the ALJ was instructed: (1) to evaluate Plaintiff's mental impairments and complete a Psychiatric Review Technique Form; (2) to give further consideration to Plaintiff's maximum residual functional capacity; (3) if necessary, to obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's impairments; (4) if warranted, to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the Plaintiff's occupational base; and (5) to conduct further proceedings to determine whether drug addiction and alcoholism are contributing factors material to the finding of disability. (Tr. 337).
On remand, the case was assigned to ALJ Craig Ellis. On September 18, 1997, Judge Ellis held a supplemental hearing. (Tr. 67-96). The ALJ determined that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 13-17).
The Appeals Council denied review of Judge Ellis' determination. (Tr. 4-5). Thus, the decision of ALJ Ellis stands as the final determination of the Commissioner.

II.

TESTIMONY BEFORE THE ALJ AT THE INITIAL HEARING
Plaintiff testified before the ALJ on July 11, 1996. Plaintiff testified that she was thirty-nine years of age. She dropped out of school in the tenth grade but then obtained her GED and also received an Associates Degree in Applied Science. (Tr. 47). Plaintiff is married and has two children. However, neither of her children live at home with her. (Tr. 58). Plaintiff reported that she has been unable to work since September 30, 1993. She did work four or five days as a substitute teacher at Warrenton School District in the Spring of 1994. However, she said when she taught those four or five days, she got headaches and developed flu-like symptoms at the end of each day. (Tr. 48).
Plaintiff testified that she was unable to work because she has headaches so often and such bad problems with her sciatic nerve that she often cannot get out of bed. She is in so much pain that it makes it hard for her to do anything. (Tr. 48).
Plaintiff stated that her back bothers her every day. (Tr. 48). The pain is in her lower spine and goes through her hips. It varies from just an ache to where she feels like she is "going to break in half." (Tr. 49). She suffers from back spasms which require her to lay down. Sometimes her back pain is so severe that she gets nauseous. (Tr. 49). She testified that she cannot do any activity for any period of time without ending up with a back ache. When she has episodes with her back, she lays down and elevates her feet. She also takes pain pills, like Tylenol with Codeine. She has tried strengthening programs to strengthen the muscles in her back. (Tr. 49). She occasionally uses a heat pad and sits in the hot tub. However, the pain returns as soon as she removes the heat source. (Tr. 50).
*948 As for Plaintiff's headaches, she testified that she has a headache every day; usually she wakes up with one. Sometimes the headaches last for a couple of hours and sometimes they will last all day. She reported suffering from migraine headaches. When she has a migraine, she must use a rectal suppository because she is vomiting and cannot keep any other medication down. She cannot tolerate any light or noise. She must go straight to bed. She used to have migraines six times a year. Recently, however, she has them only once in a while. (Tr. 50). As for the more moderate headaches, Plaintiff said she can use ice to help relieve the symptoms. She described the headaches as vascular. (Tr. 50).
Plaintiff testified that she has difficulty using her hands. She cannot work with small things. (Tr. 55). She cannot drive long distances without hurting her hands and arms. She was told by one doctor that she had fibromyalgia. (Tr. 55).
Plaintiff reported that she had pain in her pelvic area. (Tr. 55). She described it as a heaviness. "It kind of feels like there's something heavy, like an egg or something." (TR. 56). Sometimes the pain is like a stabbing hurt and other times it is a dull ache. The pain goes from her pelvic area into her groin and down her upper thigh. (Tr. 56).
Plaintiff stated that, in the past, she has had trouble with irritable bowel syndrome. This requires her to be around a bathroom and she must be careful about her diet. (Tr. 56).
Plaintiff suffers from bipolar disorder and depression. When she is depressed she cries a lot, some days for several hours. She has suicidal thoughts. She gets sick occasionally. She feels like she is "in a pit that [she] can't get out of." (Tr. 52-53). She has trouble sticking with a task. She forgets what she is doing. Stress is very difficult for her to handle. She cannot stand to be around people who are arguing or around loud noise. (Tr. 53). Plaintiff also reported that she has trouble sleeping. She wakes up in the night and she has nightmares almost every night. (Tr. 55).
Plaintiff said she takes several types of medicine. As for side effects to the medication, she testified that she is thirsty all the time. In addition, she sometimes gets drowsy. She has also become forgetful. (Tr. 51).
Plaintiff reported that she was currently being treated by Jill McNaul, M.D., at the Arthur Center in Columbia, Missouri. She sees this doctor once a month. Dr. McNaul treats Plaintiff for bipolar disorder and depression. (Tr. 51). Dr. McNaul has Plaintiff taking a number of medications and is attempting to find a medication level that keeps Plaintiff out of the depressive state without going into the manic state. (Tr. 52-53). In addition, she receives treatment by Dr. Buckles who is her primary physician. She also sees her OB/GYN, Dr. Katus. Plaintiff stated that she was seeing a massage therapist. (Tr. 63).
Plaintiff can be on her feet for about ten or fifteen minutes without difficulty. (Tr. 56). She can lift about ten pounds without hurting herself. If she tries to lift more, her back and groin hurt. She usually can sit for about an hour before she needs to get up. (Tr. 57).
Plaintiff described her typical day as follows. She stated that when she wakes up, she makes coffee and feeds the animals. She waters the plants on the deck. She talks on the phone, meets friends, and attends Bible studies. She returns home and watches the news and sometimes makes dinner. She will break up the housework throughout these periods of time so that she does not have to do anything for too long. She washes the dishes. She sweeps and vacuums. She washes clothes and makes the bed. She visits with her grandchild and occasionally babysits for her. Sometimes she goes shopping. In the evening, she might go to another Bible study or just stay at home and visit with her husband. (Tr. 54, 57-58, 62). Plaintiff generally does the grocery *949 shopping. She grocery shops about once every three weeks and her husband brings home things from the store in the interim. (Tr. 58). Plaintiff drives every other day. (Tr. 59). On some days, Plaintiff needs to stay in bed all day and keep her feet elevated. This happens once or twice a week. (Tr. 54).
Plaintiff once worked as a dietary/financial program assistant at Community Living. She helped keep the books up to state standards on the dietary guidelines in a group home for mentally retarded adults. She took care of the residents' finances (i.e., spending money) and helped them track their finances. She did not describe this job as sedentary because she had to work with the clients in every day living skills. (Tr. 59). She also worked as a receptionist for about eight months. Her duties included, among other things, helping to input data into the computer. (Tr. 60).

III.

TESTIMONY BEFORE THE ALJ AT THE SUPPLEMENTAL HEARING
Plaintiff testified again before ALJ Craig Ellis on September 18, 1997. Plaintiff testified that she was forty years of age. She is married and lives with her husband. Her daughter and granddaughter also live with them, having just moved in three weeks prior to the hearing. Her daughter is 23 and her granddaughter is 2½. Plaintiff testified that she was 5'6" tall and weighed 143 pounds. (Tr. 71-72). Plaintiff reported that her husband was employed as a tool maker for General Motors. He works at the GM Plant in Waynesville. She has health insurance benefits through his employment. (Tr. 73).
Plaintiff testified that the last time she worked at a job for wages was in 1993. She worked at the Lincoln County Senate Bill Forty Board in Troy, Missouri. She started off as a job coach for the handicapped and then moved to house manager for four women. (Tr. 74).
Plaintiff reported that there was no truth to the previous ALJ's conclusion that Plaintiff was abusing or using drugs and/or alcohol. She stated that she does not currently use "street drugs" and has not used such drugs since she appealed her decision. She last used illicit drugs about four or five years prior to the supplemental hearing. (Tr. 78-79). At that time, she smoked marijuana. She used other drugs much further in the past. (Tr. 79). As for alcohol, Plaintiff testified that she does not drink at all due to all the medication that she takes. (Tr. 79).
Plaintiff stated that her most serious medical condition that interferes with her ability to work is her pain. She has pain in her back, in her left groin, and in other random places where it just "pops up." The pain will last for six to eight weeks and then just disappear only to reappear in another area. (Tr. 80). Plaintiff said she did not believe she could work a sedentary type of job at this time because of her back pain. She said her back hurts every day. Her back pain wakes her up in the morning. She goes to bed with back pain at night. Her husband has to drive her because she cannot sit for that long and must recline in the passenger seat. (Tr. 82-83).
In addition to her pain, Plaintiff testified that she suffers from lupus. Dr. Ghosh first diagnosed Plaintiff with lupus in March or April of 1997. (Tr. 81). She also has problems with fatigue. She has a difficult time waking up in the morning. She often feels like she is going to fall asleep when she is driving the car. (Tr. 81-82). She also gets confused very easily. She believes the fatigue and confusion could be attributable to the lupus. (Tr. 81-82).
Plaintiff also suffers from headaches. She said she feels as though she has been hit and she has a lot of pressure at her temples. Sometimes she vomits with the headaches. She is very sensitive to light and needs to wear sunglasses even indoors. She gets these headaches a couple *950 of times a month. She used to get them on a daily basis. (Tr. 92).
Plaintiff testified that she has crying spells anywhere from a couple of times a month to several times a week. (Tr. 89). Plaintiff has trouble with her concentration, particularly noticeable in the past year. (Tr. 91). Plaintiff testified that she has nightmares several times a week. (Tr. 93). Plaintiff informed the ALJ that she was hospitalized for about a week in 1997. She was hospitalized at the Arthur Center in Mexico, Missouri because she was suicidal. (Tr. 83-84).
She reported side effects from her medications. They cause her to be irritable. She needs to use the bathroom frequently. She needs to avoid light. (Tr. 91).
Plaintiff stated that she does her own grocery shopping about once every two weeks. She tries to do some housework every day. She seldom cooks. She usually does the laundry with help from her husband in folding and putting away the clothes. She loads the dishwasher and does some vacuuming. (Tr. 86). Plaintiff lies down every day, usually more than once a day. Sometimes she lies down for a half an hour, sometimes for three or four hours. It depends on how bad her back is hurting. (Tr. 87-88). There are some days when Plaintiff cannot get out of bed other than to use the bathroom. (Tr. 86). She has these bad days several times a week. (Tr. 90).
According to Plaintiff, she is able to be on her feet for short periods of time. She tries to take a walk as often as possible. She can stand in one place for a few minutes, after which time her back and her groin start to hurt. She can lift a load of laundry, but not for an extended period of time. She can sit for a period of time so long as she can switch positions. (Tr. 93).
Plaintiff said she used to be active in organizations or groups but is no longer. (Tr. 86). When she was active, she attended church two or three times a week for an hour to an hour and forty-five minutes. (Tr. 86). Plaintiff also testified that she does not enjoy being around other people because she gets irritated with them. People do not understand what it is like to be sick like Plaintiff is and they expect too much from her. (Tr. 91).
Plaintiff had a fairly lengthy relationship with psychiatrist Dr. McNaul. However, she stopped seeing Dr. McNaul because people were telling her that she was being over-medicated. In addition, it was a long drive to see her and Plaintiff did not feel as though she was being helped. (Tr. 88).

IV.

MEDICAL AND OTHER RECORDS
Plaintiff was seen by John W. McAllister, M.D., on February 19, 1990. She complained of right shoulder pain which she reported having since November 1989. She said her arm was going numb. (Tr. 277). The doctor noted that Plaintiff apparently awoke one day with pain in her right shoulder with no basis for the pain. It was around the shoulder blade and particularly bothersome at night. Despite medication and a couple of steroid injections, Plaintiff apparently had no improvement with the pain. On examination, Plaintiff had full range of motion of the shoulder with no apparent instability. There was no palpable tenderness that the doctor could elicit. X-rays of the right shoulder and scapula were normal. The doctor's impression was that Plaintiff suffered from myofascitis. His plan was for Plaintiff to attend physical therapy for ultrasound, ice, heat and range of motion exercises. He also prescribed Ansaid. (Tr. 278).
On April 11, 1990, Plaintiff returned to Dr. McAllister. The doctor noted that Plaintiff had symptoms consistent with myofascitis, primarily in the trapezius area. She was also having neck pain. X-rays of her cervical spine taken this same date were normal. Plaintiff's deep tendon reflexes, biceps, triceps and brachioradialis were also normal. The doctor continued to believe that Plaintiff suffered from myofascitis. His directed Plaintiff to continue *951 exercises for myofascitis at home and prescribed pain medication. (Tr. 277).
Plaintiff saw a neurologist, Robert Yanover, M.D., in October 1991, complaining of constant head pain of three weeks' duration. (Tr. 246). It was a typical migraine headache when it began, in that it started bi-temporal, followed by nausea, vomiting, blurred vision and a feeling of weakness. However, it was unlike a migraine in that it did not subside after a few days but continued for a three week period of time. Dr. Yanover's physical examination revealed a cooperative female in no acute distress. Motor exam revealed good strength in all extremities. Sensory exam revealed no abnormalities to pain or light touch. Coordination was normal. Station and gait were unremarkable. The doctor believed that Plaintiff suffered from a common form of migraine although there were some atypical features, including awakening from sleep and the prolonged period of time the headache was lasting. The doctor recommended treatment with Compazine suppositories and pain medication with codeine. Further investigation was planned, including an MRI brain scan to rule out a vascular malformation or aneurysm. (Tr. 251-252).
Plaintiff was admitted to the St. Joseph Hospital West Emergency Room on July 25, 1992. She apparently jumped out a window while she was sleep-walking. She fell approximately eight feet. She complained of pain in her left thigh and had a large contusion. However, she complained of no back or hip pain. (Tr. 181). X-rays were taken of Plaintiff's left femur and no fractures were noted. (Tr. 182). Plaintiff was released the same day with prescriptions for pain medication and was instructed to use crutches for 48 hours. (Tr. 183).
Plaintiff was admitted to the St. Joseph Hospital West Emergency Room on August 3, 1993, with complaints of low back pain and pain in the left groin area. (Tr. 179). She was treated and released with a prescription for Toradol, a pain medication. (Tr. 180).
On October 4, 1993, Plaintiff was seen by Dr. Kathleen James complaining of chest wall pain, hand pain and occasional headaches. The doctor diagnosed Plaintiff with muscle strain, a headache and arthritis. She prescribed for Plaintiff Naprosyn (a muscle relaxant), Furinol with codeine (a pain killer), and a Capazine suppository (for her headache). (Tr. 256).
Plaintiff underwent an echocardiogram on June 29, 1994, which showed normal left and right ventricular function, normal valvular anatomy and mild mitral bowing but without true prolapse. (Tr. 186). A cardiac dopplar that same dated was normal. Mild tricuspid insufficiency was noted, which is a normal variation. (Tr. 187).
Plaintiff was seen by John Powell, M.D., on December 14, 1994. She complained of pain in the left buttock which radiated down the left leg. She said she had some intermittent leg pain since her fall out of the window two years earlier but over the last three to four months, the pain had been more constant and grown progressively worse. On examination, Plaintiff demonstrated good range of motion of the lumbar spine with minimal pain. Her left hip showed good range of motion with some slight pain on internal rotation and also on abduction. The doctor could not detect any masses in the buttock although there was some tenderness there to deep palpation. X-rays taken of the left hip showed no abnormalities. The doctor recommended anti-inflammatory medication and physical therapy. (Tr. 265).
Plaintiff began physical therapy shortly after seeing Dr. Powell. Treatment consisted of hot moist packs, interferential electrical stimulation, ultrasound and pelvic traction. This occurred three times a week for two and one-half weeks. When Plaintiff was first examined, she complained of constant dull throbbing pain primarily located in the left low back region. She reported having intermittent stabbing pain in the left anterior/posterior thighs, groin and calf musculature. At the end of the time period, Plaintiff reported a moderate *952 decrease in the low back, hip and right leg pain. Overall, she felt she had experienced a 75% improvement in her hip and leg and a 25% improvement in her back since she started therapy. (Tr. 260-261). Lumbar movement tests indicated an improved active range of motion. The therapist believed further treatment would be beneficial. (Tr. 260-264, 267-269).
Despite successful physical therapy, on January 5, 1995, Plaintiff returned to Dr. Powell with continuing complaints of pain in her lower back and left leg. She said her spine felt "unstable" when she moved. On examination, no palpable masses or tenderness in the lumbosacral spine were noted. Plaintiff had good range of motion. She remained intact on neurologic examination. X-rays of the lumbar spine taken the same day showed no evidence for gross instability but there were some questionable abnormalities involving the L5-S1 junction. Dr. Powell recommended a CT scan be done to further evaluate Plaintiff's source of continued pain. (Tr. 265).
Plaintiff returned to Dr. Powell on January 12, 1995, following her CT scan. Plaintiff's stated that her back and leg pain were about the same. Plaintiff's history and physical findings were essentially unchanged. The doctor reviewed her CT scan findings which were within normal limits. The scan did not elicit any cause for Plaintiff's radicular pain, although it did show some minimal bulging at L4-L5 and some mild degenerative changes as well. The doctor's examination was suspicious for entrapment of the sciatic nerve. The doctor decided Plaintiff should be seen by a neurologist and referred Plaintiff to Dr. Robert Yanover for his evaluation. (Tr. 259, 265-66).
Dr. Yanover examined Plaintiff on January 19, 1995, regarding pain involving her left hip and lower back. Plaintiff described the pain as having started in the past five months. Plaintiff was unable to articulate what caused the pain to start. However, she said it had slowly and progressively increased to the point where it was a constant pain. Plaintiff said the pain was worse when Plaintiff was active. (Tr. 249). Physical examination revealed that Plaintiff was in no acute distress. Examination of the head, ears, eyes, nose and throat was unremarkable. She had good range of motion in the neck. Motor examination revealed mild weakness of the left hamstring; however, there was normal muscle, bulk and tone. Sensation showed no abnormalities to light touch, or pain. Straight leg raising was negative to 90 degrees bilaterally. Reverse straight leg raising was negative. Peripheral pulses were normal. There was mild pain to palpation over the sciatic notch. Station and gait were unremarkable. Plaintiff was able to walk on her heels and toes. The doctor believed Plaintiff had a sciatic nerve symptoms. The exact etiology of this was not clear but the doctor believed further investigation was warranted. Thus, Dr. Yanover recommended an electromyography ("EMG") and nerve conduction studies. (Tr. 249-250). Plaintiff underwent an EMG and nerve conduction studies on January 26, 1995. No abnormalities were present. (Tr. 184-185, 247-248).
On February 2, 1995, Plaintiff went to the St. Joseph Hospital West Emergency Room with epigastric complaints. (Tr. 172, 386). A CT scan of the abdomen and pelvis was essentially negative. (Tr. 173, 297). X-rays of Plaintiffs chest showed no active disease but did show scoliosis of the lower thoracic spine to the right. (Tr. 174, 385). An electrocardiogram was normal. (Tr. 177). Plaintiff was discharged that same date with prescriptions for Darvocet for pain, and Narflex. (Tr. 175).
On February 14, 1994, Plaintiff returned to Dr. Yanover. She informed him that her hip pain had improved considerably over the past few weeks. She denied any problems with tingling or numbness in her legs. Neurologic exam revealed good strength in both lower extremities. Sensation was unremarkable to pain or light touch. Motor exam revealed full strength in all extremities. Straight leg raising was negative to 90 degrees. There was no pain *953 to palpation over the sciatic notch. Peripheral pulses in the lower extremities appeared normal. The doctor believed that Plaintiff's sciatic neuropathy was improving. (Tr. 244, 291).
On March 6, 1995, Plaintiff was seen by Abigail Moore, M.D. The doctor noted that Plaintiff was a 37-year-old female with a history of bipolar disorder She was experiencing decreased sleep and a decreased ability to make clear judgments. She also had increased impulsivity, mood swings, and sensitivity to stimuli, especially noise. Plaintiff also stated that she felt depressed, guilty, worthless and had a decreased appetite. She acknowledged having suicidal thoughts but no plans. She also said she had nightmares and flashbacks to traumatic hospitalization. She acknowledged that she drinks socially and had a history of multi-substance abuse, which was in remission. (Tr. 217). Despite Plaintiff's complaints, mental status exam revealed good eye contact, above average intelligence, intact thought process, good judgment and good insight. The doctor's diagnosis was: (1) Bipolar disorderdysphoric manic episode; and (2) History of multi-substance dependence. (Tr. 219).
Plaintiff returned to Dr. Moore on March 20, 1995. She stated that she still felt as though she was having a lot of mood swings, but many emotional things had recently happened. The doctor adjusted Plaintiff's medications. (Tr. 216). On April 10, 1995, Plaintiff again saw Dr. Moore and indicated that she was not feeling much better. She said she is feeling depressed and was having flashbacks of bad memories. Dr. Moore advised Plaintiff to get therapy. (Tr. 216). On May 4, 1995, after Plaintiff described an incident between Plaintiff and her husband to Dr. Moore, the doctor recommended that Plaintiff and her husband seek marital counseling. (Tr. 216).
Plaintiff returned to Dr. Yanover on May 18, 1995. Plaintiff reported that she continued to have severe pains involving her left hip and leg which were magnified by any activities such as bending or sitting. She also experienced a tingling sensation in the posterior thigh. Her left leg feels weak. She has noted occasional pains in the upper part of her body including the lateral abdomen and chest, particularly on the left side. Straight leg raising produced mild pain on the left side at 90 degrees. There was mild pain to palpation over the left posterior buttock. There was moderate pain to palpation in the peroneal area on the left side. No mass was palpated. Sensation was normal to pain and light touch. Motor exam revealed full strength in both lower extremities. The doctor was still unable to determine the cause of Plaintiff's pain. (Tr. 234, 290).
On May 22, 1995, Plaintiff underwent a CT scan of her lumbar spine. No significant change was noted since her previous examination. There was still some minimal midline posterior bulging at the L4-L5 intervertebral disc. The L5-S1 intervertebral disc was unremarkable. It was again noted that there was some mild degenerative changes of the lower lumbar facet joints. (Tr. 169, 296, 387).
On May 31, 1995, Plaintiff was seen again by Dr. Abigail Moore. Plaintiff told Dr. Moore that she was depressed three to five days a week. She reported having highs of euphoria and irritability and impulsivity two to three day's a week. The doctor started her on Zoloft and Klonopin. (Tr. 215).
Plaintiff saw Kevin Foster, M.D., on June 6, 1995, with complaints of pelvic pain. The doctor suspected adhesions. (Tr. 223-224). Dr. Foster's suspicions were confirmed on June 19, 1995, when he performed a diagnostic laparoscopy on Plaintiff. The laparoscopy revealed that Plaintiff suffered from extensive pelvic adhesions and abdominal adhesions. Dr. Foster corrected the adhesions during the laparoscopy. (Tr. 191-194). In two postoperative visits with Dr. Foster over the next several weeks, Plaintiff stated she was doing better. Her incision healed and her pain was clearly improved. (Tr. 222).
*954 On July 11, 1995, Dr. Moore noted that Plaintiff was doing much better on Zoloft. Plaintiff reported being less depressed, having more energy, her mood swings were much better and her irritability was decreased. (Tr. 215).
On July 26, 1995, six weeks after her laparoscopy and lysis of adhesions by Dr. Foster, Plaintiff presented to Roger A. de la Torre, M.D, with complaints of intractable abdominal pain mostly in the left groin and pelvis. Dr. de la Torre noted that Plaintiff's overall symptoms improved following her laparoscopy; however, the pain in the left groin, which radiated down the thigh, still persisted. The doctor noted that Plaintiff was a healthy-appearing female who presented in no acute distress. There was no voluntary or involuntary guarding of the abdomen. There was no percussion tenderness or rebound. Extremities showed a good range of motion. The doctor's impression was "Intractable pain of several year duration and a question of a left sided inguinal hernia." (Tr. 239-240).
One month later, Plaintiff was seen by Dawn Flegel, M.D., again complaining of left lower quadrant pain of about two years' duration, which had worsened in the past months. Examination revealed no evidence of palpable hernias. There was pain in the left lower quadrant with deep palpation. The doctor believed Plaintiff would require and IVP and upper GI, as well as a barium enema, if her symptoms persisted. (Tr. 235).
Apparently, Plaintiff's symptoms did persist as, on August 18, 1995, Plaintiff underwent a barium enema. It was a normal barium enema study. (Tr. 228). Plaintiff also had a "scout abdomen" survey done which revealed mild levoscoliosis of the lumbar spine as well as a prior lumbar myelogram. Otherwise, the survey was unremarkable. (Tr. 230). Plaintiff then underwent an IVP with tomograms. The pyelocaliceal system on the left was normal. There was some dilatation of the right pyelocaliceal system and right ureter, which may be associated with adhesions, an acute change of direction in this area or extensive pressure from the soft tissues of the regain. Otherwise, it was a normal study. (Tr. 229). An upper GI series revealed no abnormality of the esophagus, stomach or duodenum. A GI series of the small bowel revealed a normal stomach and small bowel. (Tr. 227).
Plaintiff was seen by Steven Archer, D.O., on August 25, 1995. The doctor noted that Plaintiff was a 38-year old female with chronic progressive pain radiating from her left mid abdomen. Physical examination was negative. The doctor's impression was chronic pain with questionable etiology with a long-standing narcotic requirement. The doctor recommended that Plaintiff be evaluated at a pain clinic. (Tr. 221).
Plaintiff returned to Dr. Abigail Moore on September 7, 1995. The doctor noted that Plaintiff was doing well on her current medications. Plaintiff told the doctor that she was "more even keeled than ever in [her] life." Plaintiff said that she was still in a lot of pain. Dr. Moore told Plaintiff that she needed to call her family physician to get a prescription for Vicodin for her pain. The doctor noted that Plaintiff has a history of multi-substance abuse so this would need to be watched carefully. (Tr. 215).
On September 28, 1995, Plaintiff was admitted to the emergency room at St. Joseph Hospital West in Lake St. Louis, Missouri, with complaints of low back pain and a stomach ache which she had been suffering from for about a month but which had recently worsened. (Tr. 163-164). X-rays of her chest showed no active disease. (Tr. 167, 380).
On September 29, 1995, Plaintiff was seen by Paul W. Deschamp, D.C., a chiropractor in Wentzville, Missouri. The doctor certified on that date that Plaintiff had "recovered sufficiency to be able to return to light work on 9/29/95." He placed the following restrictions on her, however: no lifting, no bending, no stooping and no prolonged standing. (Tr. 212). Plaintiff *955 continued to see Dr. Deschamp on September 30, October 5, 6, 10 and 13, 1995. Dr. Deschamp noted on November 12, 1995, that Plaintiffs clinical course had been progressive. His diagnosis was scoliosis accompanied by myofascitis, spasm, neuritis and resultant limitation of motion and pain. Her prognosis was guarded. (Tr. 209).
On October 5, 1995, Plaintiff reported to Dr. Moore that she was feeling relieved to be working with a chiropractor who was helping her. She felt "somewhat better now." (Tr. 214, 287). On November 6, 1995, however, Plaintiff told Dr. Moore that she was doing a little worse. She complained of nightmares and anxiety. The doctor recommended yoga, swimming and a book on pain. (Tr. 214, 287).
On December 11, 1995, Plaintiff was seen by Richard B. Buckles, D.O., for a routine disability history and physical. Her complaints were many but her major complaints seemed to be back pain and chronic headaches. Plaintiff reported that she had suffered from back pain since she was a teenager but it has worsened in the past two years. She had several injuries over the past years and she claimed these worsened the discomfort in her back. She told Dr. Buckles that the pain was located in the mid to low back area, it radiated down the sides and to the legs, and it was constant. Plaintiff also described headaches. She told the doctor that she had migraines two to three times per year which were incapacitating. She also described chronic headaches not as severe as the migraines. (Tr. 203). Finally, Plaintiff complained of left lower quadrant pelvic pain, which she described as a chronic constant problem. The doctor noted that Plaintiff's past medical history was positive for peritonitis, mitral valve prolapse and pleurisy. She had also undergone a hysterectomy and laparoscopy and had a polyp removed from the ureter. (Tr. 204).
Physical examination by Dr. Buckles revealed a well-nourished female weighing 124 pounds at 5'6" tall. Plaintiff exhibited pain in the left pelvic region to palpation. No masses were evident, however. Plaintiff also exhibited some lumbosacral tenderness to palpation. Mild muscle spasms were present in this same area. No joint deformity or erythema was present. Plaintiff was able to get on and off the exam table without difficulty. Pulses in the upper and lower extremities were good. Plaintiff's affect was normal. Recent and remote memory was intact. Her gate was normal, although she did walk somewhat stooped over for pain relief in the lumbosacral region. Sensory exam was normal. Plaintiff was able to heel/toe walk and she was able to squat. The doctor's impressions following physical examination were: (1) multiple back injuries with degenerative joint disease; (2) migraine headaches by history; and (3) chronic pelvic pain. (Tr. 204-205).
On March 14, 1996, Plaintiff underwent a psychiatric evaluation by Jill McNaul at the Arthur Center. Plaintiff's chief complaint was that she had been having problems with depression since she was seven years old. She was diagnosed with bipolar disorder at age 15. She reported a long history of mood disorder. She said she had been diagnosed as a manic-depressive by five different psychiatrists. She admitted to having numerous manic and depressive episodes in the past, too numerous to count. She has more than four cycles per year.
Plaintiff reported feeling depressed for the past several months. Her sleep was poor. She complained of very graphic and vivid nightmares which awaken her from her sleep. Her appetite was satisfactory. Her energy was low. Her concentration was variable. She, lately, has been forgetful. Her mood has been depressed. Her interest and initiative are variable. She admitted to frequent thoughts of death and occasional suicidal thoughts, but her daughter, granddaughter and her religion kept her from acting on this. Plaintiff reported having chronic pelvic pain, migraine headaches, scoliosis and pain in her lower spine, and severe irritable bowel *956 syndrome. She admitted to marital problems and said she was separating from her husband. (Tr. 313-314, 407-408).
Plaintiff told Dr. McNaul that she had one psychiatric hospitalization at age 29. She has not had any other psychiatric hospitalizations. She has been treated with a variety of different medications in the past. She said she jumped out a window one time when she was asleep three years ago and hurt her leg. She also had an overdose on illegal drugs on two occasions; however, these were both accidental and not intentional suicide attempts. (Tr. 314, 408). Plaintiff admitted to having a history of alcohol abuse in the past. She also admitted to trying numerous illicit drugs in the past including "marijuana, LSD, THC, Dilaudid, crystal, amphetamines, yellows, reds and cocaine." She said she has not used any illicit drugs for the past 2½ years. (Tr. 315, 409).
Dr. McNaul's mental status examination of Plaintiff noted that Plaintiff was tearful throughout the early portion of her interview. She sat with slumped posture and had intermittent eye contact. Her speech was soft and slow. Her thoughts were generally organized and goal directed. Her thought content focused on how miserable she was in her home life. She was alert and grossly oriented. She performed satisfactorily on tests of concentration. Her insight and judgment appeared to be mildly impaired by her depression. Her intellectual functioning was estimated to be in the average range. Her mood and affect were depressed. The doctor's impressions were: (a) bipolar disorder, depressed rapid cycling type by history; (2) rule out somatization disorder; (3) marital problems; (4) history of polysubstance abuse in remission; and (5) history of alcohol abuse in partial remission. (Tr. 410). The doctor instructed Plaintiff to continue taking Zoloft and Lonopin, begin individual therapy to deal with her emotional stressors, begin marital therapy, and utilize support from her friends. (Tr. 316-317, 410-411).
Progress notes from Dr. McNaul dated March 25, 1996, stated the following. Plaintiff continued to feel depressed. She had middle and terminal insomnia. Her appetite was low and her energy level was bad. She continued to complain of abdominal and pelvic pain. Her concentration was "awful." She continued to report suicidal thoughts. She did not have any days when she felt manic during the past week. Plaintiff succeeded in separating physically from her husband. She described the situation as very emotional. The doctor assessed Plaintiff with bipolar disorderdepressed and indicated that Plaintiff had multiple stressors. Plaintiff's medications were adjusted. (Tr. 311, 405).
Dr. McNaul's progress notes from April 22, 1996 reveal that Plaintiff's situation was basically unchanged. (Tr. 307, 401). Her progress notes from June 3, 1996, noted that Plaintiff stopped taking one of her medications because she thought it was making her sick. Plaintiff reported some ongoing depressive symptoms but indicated that during the past week she was feeling a little more high. She said she laughed easily and had more energy. (Tr. 304, 398). Dr. McNaul's July 1, 1996, progress notes show little improvement in Plaintiff's condition. (Tr. 300, 397).
On July 9, 1996, Dr. McNaul completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" form. She noted that Plaintiff had fair to poor ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with a supervisor, deal with work stresses, function independently and maintain attention/concentration. The doctor noted that Plaintiff reported significant problems with concentration. (Tr. 298). The doctor found Plaintiff had poor ability to understand, remember and carry out even simple job instructions. The doctor noted that Plaintiff reported being easily distracted. (Tr. 299). Finally, the doctor noted that, although Plaintiff had a fair to good ability to maintain personal appearance, she had poor to no ability to *957 behave in an emotionally stable manner, relate predictably in social situations or demonstrate reliability. (Tr. 299). The doctor did believe that Plaintiff appeared competent and able to manage her finances. (Tr. 299).
Plaintiff returned to Dr. McNaul on August 5, 1996. Plaintiff reported ongoing stressors. She was taking care of her granddaughter several days a week because of difficulties her daughter was having. Her marriage continued to remain strained. She was occasionally tearful. She was still having some mood instability although this had improved somewhat. She complained of having gruesome nightmares and clenching her teeth at night. Because of her physical complaints, she was not able to do much exercise but said she does do some walking, gardening, reading and goes in the Jacuzzi for relaxation. Plaintiff stated that her appetite had decreased somewhat and she is having occasional headaches which appear to be stress induced. The doctor adjusted Plaintiff's medications. (Tr. 396).
Plaintiff had an MRI of the lumbar spine taken on September 12, 1996. It showed degenerative disc changes at the level of L5-S1 with midline posterior protrusion. (Tr. 379).
On October 18, 1996, Plaintiff was seen by Daniel Scodary, M.D. at North County Neurosurgery, Inc. The doctor noted that Plaintiff was a thirty-nine year old woman who had a two-year progressive history of lower back pain with radiation into the left groin and thigh. She denied alcohol and tobacco abuse. On physical examination, her heart, lungs and abdomen were normal. Neurologically, she had a completely normal exam. An MRI of Plaintiff's lumbar spine dated September 12, 1996, was remarkable only for degenerative disc disease at L5-S1 with no obvious nerve root compression. The doctor did not see surgical pathology but he gave Plaintiff the option for either myelographic evaluation or treatment in the pain center by Dr. Chen. She opted for the pain center treatment. (Tr. 375-376).
On October 25, 1996, Plaintiff was seen by Dr. Chen at the Pain Management Center at Christian Hospital Northwest. She had been experiencing constant low back pain with radiation to the vaginal area and inner aspects of both thighs for the past three years. She described the pain as burning, stabbing and throbbing. She reported that over the past several months, the pain had become constant and bothered her lifestyle. Physical examination showed a somewhat nervous female appearing to be in slight distress because of pain. Her abdomen was soft, benign and nontender. Examination of the back revealed normal curvature of the spine without tenderness. There was some hyperesthesia and allodynia noticed over the inner aspect of both thighs. The doctor's clinical impression was: (1) sympathetically maintained pain, from lumbar radiculopathy; and (2) review of the MRI dated 1995 showed multiple bulging discs without definite evidence of disc herniation. The doctor recommended a trial series of lumbar sympathetic nerve blocks as a means of desensitization. (Tr. 366-367). The doctor performed the first lumbar sympathetic nerve blocks after his examination of Plaintiff. (Tr. 370-374).
Plaintiff was seen by Dr. McNaul on November 14, 1996. She reported having had a very hectic past few weeks. She was sick, she had problems with her granddaughter, and was concerned that her daughter may be depressed. However, Plaintiff reported that, overall, her moods have been better. Plaintiff reported that she was "still feeling somewhat stressed by her job, although says she likes it." She was pleased that her husband was being very supportive. Plaintiff was friendly and cooperative during the session. Her thoughts were organized and goal directed. Her affect appeared brighter. Her mood was more level. She said she felt that the medication had been helping her. (Tr. 393-394).
Plaintiff saw Dr. Chen again on November 18, 1996 with complaints of increased *958 pain. The doctor diagnosed Plaintiff with lumbar radiculopathy. (Tr. 361). He gave her an epidural steroid injection that date. (Tr. 362-365).
On November 21, 1996, Plaintiff talked with Dr. McNaul and reported that she was feeling a little more depressed. She reported having had "fits of hysteria," panic attacks and difficulty maintaining her train of thought. She was not sleeping well and had mood swings. She admitted to feelings of anger and loss of control. Dr. McNaul recommended that Plaintiff see a therapist to work on some of her personal issues. The doctor adjusted her medications to help her with sleeping. (Tr. 392).
On January 16, 1997, Plaintiff returned to Dr. McNaul. The doctor noted that Plaintiff had dealt with multiple stressors since the last visit. Plaintiff told the doctor that she had to be hospitalized the previous month because of the pain and immobility. In addition, she had a very close friend die and her two-year-old granddaughter became very ill after she took one of Plaintiff's pills. Despite this, the doctor noted that during the session Plaintiff was pleasant and cooperative. She was able to smile and joke a little about the stressors in her life. She had normal speech and did not appear to be either depressed or manic. The doctor noted that Plaintiff was doing relatively well despite multiple stressors. (Tr. 390-391).
On February 20, 1997, Plaintiff was admitted to the Audrain Medical Center in Mexico, Missouri. Plaintiff reported upon hospitalization that her husband "has been yelling at me, harassing me, yanking my head around, twisting my arm. He frightened me so much. I went downstairs and got a knife and tried to cut my wrists. This all happened last night." She reported a history of chronic depression, fibro-myalgia syndrome and chronic back pain. Plaintiff acknowledged that she had past use of illegal drugs. In the past she has used marijuana, LSD, Dilaudid, amphetamines, cocaine and other drugs. She injected intravenously as a teenager. She said her drug of choice was marijuana but she quit to become active as a Jehovah's Witness. (Tr. 346-347). She said she had a history of alcohol abuse. However, she continued to drink occasionally. (Tr. 347).
While in the hospital, Plaintiff was initially on precautions for her own safety. She was involved in the dual disorders treatment program for both psychiatric and chemical dependency treatment issues. (Tr. 347). She was discharged on February 23, 1997 in a stable condition. Her prognosis was guarded. It was believed that her goals of treatment were met in that she got through the severe depression. She benefitted significantly from brief inpatient crisis stabilization and agreed to aftercare planning and discharge recommendations. (Tr. 349). Her final diagnosis upon discharge was: (1) bipolar I disorder, mixed, most recent episode, depressed; (2) somatization disorder; (3) polysubstance dependence in remission; and (4) partner relational problems. (Tr. 344-345).
On April 8, 1997, Plaintiff was seen by Dr. Ghosh for her complaints of groin pain. The doctor noted that her hip joints moved well. (Tr. 356). The doctor treated her with a lumbar epidural steroid injection. (Tr. 355). She was prescribed a pain medication with codeine. (Tr. 356).
In May 1997, Plaintiff underwent a CT scan of her chest due to complaints of chest pain. There was no evidence of definite lung abnormality. All was essentially normal but for a small 1-cm cyst on the liver which was non-specific. (Tr. 433).
On July 17, 1997, Plaintiff was seen by Terry Moore, M.D, of the St. Louis University Department of Rheumatology. Physical examination revealed mild paravertebral spasm. Abdomen was soft with mild diffuse tenderness in the right upper quadrant, but no masses or organomegaly were detected. All joints showed full range of motion without swelling or tenderness. Extensive testing revealed nothing remarkable. (Tr. 438-451).
*959 On September 9, 1997, Plaintiff was admitted to St. Joseph Hospital West with complaints of chest pain. (Tr. 426). An electrocardiogram was normal. (Tr. 429). Chest x-rays showed no active disease. (Tr. 431). Plaintiff was diagnosed with a panic attack. (Tr. 427).
Plaintiff was seen again by Dr. Terry Moore on September 30, 1997. She complained of diffuse myalgia and arthralgia with extreme fatigue. She reported improvement in sleep. (Tr. 437). Physical exam was essentially unremarkable. (Tr. 435-436).
On October 20, 1997, Plaintiff was evaluated by Russel M. Newton, Ph.D., a psychologist with Columbia Psychological Services, Inc. Plaintiff was referred to him by the Missouri Division of Disability Determinations for a Minnesota Multiphasic Personality Inventory ("MMPI") with report, completion of a medical assessment form, and a psychological consultation with history and report. Plaintiff's allegations were multiple back injuries, chronic headaches, sciatic nerve pain, left lower quadrant pain, an old left leg injury and abdominal pain. Plaintiff stated that she did not feel well, had pain in her joints constantly, has headaches, alleges a diagnosis of Bipolar Disorder since age 15 years, and has all-day crying spells. She was hospitalized in 1992 and 1996 for psychiatric problems. She said she feels "out of control." She complained of early morning insomnia, some bad dreams, loss of appetite and unintended weight loss. The doctor noted that Plaintiff's thought processes were associated and coherent. She did not appear excessively anxious, but did tear up during the interview. The doctor noted no impairment in Plaintiff's cognitive functioning due to intrusive thoughts, anxiety or other interference. Plaintiff's concentration was intact. (Tr. 418-419).
On the MMPI, Plaintiff generated a valid profile with a balanced approach to self-disclosure versus self-protection. The test showed a pronounced focus on physiologic problems, a propensity for conversion of psychological distress into physiologic problems, an effort to localize the source of anxiety outside herself, and minimal insight into her psychological problems. Plaintiff was using somatic complaints to avoid thinking of or dealing with psychological problems. She was under acute severe situational stress. She has markedly low ego strength. Testing showed she gave the distinct impression of an explicit attempt to emphasize depressive aspects of her existence and to present herself in the worst possible light. (Tr. 420). The doctor diagnosed Plaintiff with: (1) adjustment disorder, with mixed anxiety and depressed mood, chronic; (2) alcohol dependence in sustained full remission; (3) polysubstance dependence, in sustained full remission by report; and (4) malingering. (Tr. 421).
The doctor's conclusions were as follows:
1. Maureen Kovach is a middle aged woman with an intact ability to recall all pertinent aspects of her current and more distant history. She is readily able to process information about her environment, has good concentration and attention, appropriate interpersonal skills, and indications are strong for average to above average intelligence as evidenced by her ability to process thoughts abstractly, as well as her history of earning an Associate's Degree. She appears to have a relatively good employment potential in areas that would not exacerbate any pain problems that she experiences.
2. Claimant is under very substantial situational stress because of her daughter's and son's behaviors, which in my opinion, cause many of her adjustment difficulties. These are not ordinarily thought of as "disabling mental conditions."
(Tr. 421).
The doctor completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" form. In that he stated that Plaintiff had primarily fair to good ability to follow work rules, relate to co-workers, deal with the public, use judgment, *960 interact with supervisors, deal with work stresses, function independently and maintain attention and concentration. (Tr. 422). She had good ability to understand, remember and carry out complex instructions as well as detailed, but not complex, job instructions. She had very good capabilities to understand, remember and carry out simple job instructions. (Tr. 423). The doctor noted that she had a good ability to maintain personal appearance, relate predictably in social situations and demonstrate reliability. She had a fair ability to behave in an emotionally stable manner. (Tr. 423).

V.

DETERMINATION OF THE ALJ
After considering the evidence of record, the ALJ concluded that Plaintiff was not under a "disability," as that term is defined in the Social Security Act, at any time through the date of the decision. (Tr. 29). He found that Plaintiff met the disability insured status requirements on September 30, 1993. (Tr. 28). Judge Ellis noted that Plaintiff had not engaged in substantial gainful activity since at least September 30, 1993. (Tr. 28).
The ALJ assessed the medical records and set forth Plaintiff's medical history. (Tr. 20-21). He determined that the medical evidence established that Plaintiff had a possibility of a mild connective tissue disease, a history of drug and alcohol abuse, a chronic adjustment disorder with mixed anxiety and depressed mood, mild mitral valve prolapse, infrequent migraine headaches, and degenerative disc disease of the lumbar spine without herniation or nerve root impingement. However, she did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 15-23).
The ALJ next determined whether Plaintiff could perform her past relevant work and, if not, whether there was other work she could perform. In making this determination, the ALJ assessed Plaintiff's residual functional capacity. The medical evidence and Plaintiff's subjective complaints were considered in determining her residual functional capacity.
The ALJ found that Plaintiff's testimony, insofar as it related to disabling and debilitating subjective complaints, was not credible and therefore not entitled to significant weight and consideration. Considering Plaintiff's allegations pursuant to Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir.1984), the ALJ listed the following factors which detracted from Plaintiff's credibility: (1) the objective medical evidence does not support Plaintiff's complaints; (2) Plaintiff failed to follow prescribed treatment; (3) no physician determined Plaintiff to be disabled within the confines of the Social Security Act; (4) Plaintiff's daily activities were inconsistent with disabling impairment; (5) there is evidence that Plaintiff was working during the time period she claimed to be disabled; this detracts from her assertion that she is disabled; (6) the fact that Plaintiff failed to report that she was working at a job to the Social Security Administration substantially detracts from her overall credibility; (7) Plaintiff's earnings record indicates a sporadic earnings history and does little to enhance Plaintiff's credibility; (8) inconsistencies exist in the record which detract from Plaintiff's credibility; (9) the evidence strongly suggests that Plaintiff's complaints of pain are linked to drug seeking behavior; and (10) Plaintiff's "bogus" claims that the previous ALJ was "unfair and made false statements" detracts from Plaintiff's credibility. For all of these reasons, the ALJ concluded that Plaintiff was not a credible witness.
The ALJ found that Plaintiff's impairments precluded lifting more than ten pounds and engaging in standing and walking for several hours in an eight hour day. However, the ALJ found that Plaintiff could perform prolonged sitting. The medical evidence did not establish the existence of any other persistent, significant, and adverse limitation of function due to *961 any other ailment. The ALJ concluded that Plaintiff could perform a full range of sedentary work and there was nothing in the record to preclude Plaintiff from performing this full range of sedentary work. The ALJ found that Plaintiff's mental impairments were nonsevere and imposed, at most, mild limitations that did not substantially compromise the range of sedentary work activity that Plaintiff could perform. (Tr. 27).
The ALJ noted that Plaintiff described her past work as a receptionist as involving only occasional bending, walking for no more than one hour, no significant lifting or carrying, and sitting for about seven hours per day. She answered phones, set up appointments, greeted patients, typed letters, and entered patient information into the computer. The ALJ found that Plaintiff's residual functional capacity did not preclude her from performing her past relevant work as a receptionist as she had performed it. (Tr. 28-29).
Because the ALJ found that Plaintiff could perform her past relevant work, the ALJ concluded that Plaintiff was not disabled. Thus, Plaintiff was not entitled to a period of disability or disability insurance benefits under sections 216(I) and 223, respectively, of the Social Security Act. (Tr. 29).

VI.

LEGAL STANDARDS
Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. First, the claimant cannot be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities...." Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, then the claimant is per se disabled. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(f), 416.1520(f). If claimant meets these standards, the ALJ will find the claimant to be disabled.
The ALJ's decision is conclusive upon this Court if it is supported by "substantial evidence." Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992); Cline v. Sullivan, 939 F.2d 560, 564 (8th Cir.1991). It is not the job of the Court to reweigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir.1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir.1992). Instead, the Court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Naber v. Shalala, 22 F.3d 186, 188 (8th Cir.1994); Onstead, 962 F.2d at 804. Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987).
Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir.1984). In Bland v. Bowen, 861 F.2d 533 (8th Cir.1988), the Eighth Circuit Court of Appeals held:
[t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant *962 or deny benefits without being subject to reversal on appeal.
Id. at 535. See also Metcalf v. Heckler, 800 F.2d 793, 794 (8th Cir.1986); Clark v. Heckler, 733 F.2d at 68. Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion. Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir.1991); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir.1989).
To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:
(1) The findings of credibility made by the ALJ;
(2) The education, background, work history, and age of the claimant;
(3) The medical evidence given by the claimant's treating physicians;
(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
(5) The corroboration by third parties of the claimant's physical impairment;
(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
(7) The testimony of consulting physicians.
Brand v. Secretary of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir.1980); Cruse v. Bowen, 867 F.2d at 1185.
The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 416(I)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving that he has a disabling impairment. Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir.1993); Roach v. Sullivan, 758 F.Supp. 1301, 1306 (E.D.Mo.1991).
"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). When evaluating evidence of pain, the ALJ must consider:
(1) the claimant's daily activities;
(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
(3) any precipitating or aggravating factors;
(4) the dosage, effectiveness and side effects of any medication; and
(5) the claimant's functional restrictions.
Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir.1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors as well as the plaintiff's appearance and demeanor at the hearing. Polaski, 739 F.2d at 1322; Cruse v. Bowen, 867 F.2d 1183 (8th Cir. 1989).
The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir.1992); Ricketts v. Secretary of Health & Human Services, 902 F.2d 661, 664 (8th Cir.1990); Jeffery v. Secretary of Health & Human Services, 849 F.2d 1129, 1132 (8th Cir.1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Id.; Butler *963 v. Secretary of Health & Human Services, 850 F.2d 425, 426 (8th Cir.1988). Although credibility determinations are in the first instance for the ALJ and not the court, the ALJ's credibility assessment must be based upon substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir.1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir.1985).
When, as here, a plaintiff claims that the ALJ failed to properly consider subjective complaints of pain, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir.1987).
Where the ALJ holds that the plaintiff cannot return to his past relevant work, the burden shifts to the Commissioner to show other work that the plaintiff could perform in the national economy. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir.1983). This is a two-part burden. First, the Commissioner must prove that the plaintiff has the residual functional capacity to perform other kinds of work. Residual functional capacity is defined as what claimant can do despite his limitations (20 C.F.R. § 404.1545(a) (1983)), and includes an assessment of physical abilities and mental and other impairments. (20 C.F.R. § 404.1545(b), (c), (d) (1983)). The Commissioner has to prove this by substantial evidence. Warner, 722 F.2d at 431. Second, once the plaintiff's capabilities are established, the Commissioner has the burden to demonstrate that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Id.
To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 176; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir.1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir.1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir.1989).

VII.

DISCUSSION
The issue before the Court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir.1992). Substantial evidence is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir.1992). Thus, even if there is substantial evidence which would support a decision opposite to that of the Commissioner, the Court must affirm his decision as long as there is substantial evidence in favor of his position. Jones, 86 F.3d at 826.
Plaintiff states that substantial evidence does not support the ALJ's determination. Specifically, Plaintiff claims that the ALJ erred in the following respect: the ALJ improperly evaluated Plaintiff's treating physician's records and opinions. Defendant disagrees. Upon reviewing the administrative record as a whole, the undersigned finds that the decision of the ALJ in the instant cause of action is supported by substantial evidence.

A. OBJECTIVE MEDICAL EVIDENCE
The ALJ's decision is supported by the objective medical evidence. While *964 there is no doubt that Plaintiff suffers from some limitations as a result of her impairments, there is no objective medical evidence suggesting that Plaintiff's impairments or a combination of the impairments are significant enough to cause permanent disability precluding the performance of any substantial gainful activity.

1. Headaches
First, the objective medical evidence does not support a finding that Plaintiff suffers from disabling headaches. In October 1991, Plaintiff saw Dr. Yanover due to a headache which had lasted three weeks. However, physical examination revealed that Plaintiff was in no distress. Examination was normal. Plaintiff received no further treatment for headaches until December 1995.
In 1995, Plaintiff told her physicians that she suffered severe migraine headaches only two to three times a year. Although Plaintiff states that she also suffers from less severe headaches on a frequent basis, this is not borne out in the notes of her physicians.
In addition, Plaintiff reported that she only takes aspirin for these more frequent headaches.. The use of such limited medicine for her headaches is not indicative of a disabling impairment. Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir.1994). See also Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir.1987) (treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); Cruse v. Bowen, 867 F.2d 1183, 1187 (8th Cir.1989) (minimal consumption of pain medication reveals lack of disabling pain); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir.1988) (failure to seek aggressive treatment and limited use of prescription medications not suggestive of disabling pain).

2. Back/Leg Problems
Second, the objective medical evidence does not support a finding that Plaintiff suffers from disabling back or leg problems. She complained to Dr. Powell of this in 1994. However, on examination she demonstrated good range of motion with only slight pain on rotation. X-rays of the left hip showed no abnormalities. Plaintiff underwent physical therapy in December 1994 and January 1995, after which she reported a decrease in the pain in the hips and back. She returned to Dr. Powell with continued complaints but, again, on examination no palpable masses or tenderness were noted and Plaintiff had good range of motion of her lower back and left leg. X-rays of the lumbar spine were negative for gross instability. A CT scan in January 1995 showed only minimal midline posterior bulging at the L4-L5 intervertebral disk. Dr. Powell's examination on January 12, 1995 was suspicious for entrapment of the sciatic nerve.
Physical examination by Dr. Yanover in January 1995, revealed that Plaintiff was in no acute distress. There was only mild pain to palpation over the sciatic notch. Plaintiff's station and gait were unremarkable. Plaintiff was able to walk on her heels and toes. In February 1995, Dr. Yanover noted that Plaintiff no longer had pain to palpation over the sciatic notch and that her sciatic neuropathy, of questionable etiology, was improving.
In May 1995, Plaintiff returned to Dr. Yanover, continuing to complain of pain. However. the doctor found only mild pain to palpation over the left posterior buttock, straight leg raising produced only mild pain on the left side at 90 degrees, there was only moderate pain to palpation in the peroneal area on the left side, no mass was palpated, sensation was normal and motor examination revealed full distribution. The doctor was still unable to determine the source of Plaintiff's pain.
Another CT scan of Plaintiff's lumbar spine showed no significant change. An MRI of the lumbar spine taken in September 1996 revealed degenerative disc disease of unchanged magnitude. There was no obvious nerve root compression. Dr. Scodary, who evaluated Plaintiff at that time, did not see any surgical pathology and referred Plaintiff to a pain clinic.
*965 Plaintiff was seen at the pain clinic. There, Dr. Chen noted that examination of Plaintiff's back revealed normal curvature of the spine without tenderness. Dr. Chen could not determine the etiology of Plaintiff's complaints but treated her with steroid injections.
Plaintiff was treated by Dr. Ghosh in March and April 1997 for her pain in the hip and groin area. The doctor noted that her hip joints moved well. He treated her with a lumbar epidural steroid injection.
This objective medical does not suggest that Plaintiff suffers from disabling pain in her back and legs. This supports the ALJ's conclusion that Plaintiff's back and leg pain does not preclude her ability to return to her past relevant work as a receptionist.

3. Abdominal Pain
Third, the objective medical evidence does not support a finding that Plaintiff suffers from disabling abdominal pain. Plaintiff first presented with this problem in February 1995. A CT scan of the abdomen and pelvis was negative.
In June 1995, Plaintiff was seen by Dr. Foster with complaints of pelvic pain. The doctor suspected adhesions and this diagnosis was confirmed when Plaintiff underwent a diagnostic laparoscopy. He corrected the adhesions during the laparoscopy. Following this procedure, Plaintiff stated she was doing better. When she returned to Dr. Foster in July 1995, she indicated again that she was feeling better.
Plaintiff complained to Dr. de la Torre at the end of July 1995 of abdominal pain. Although Plaintiff complained of pain in the left groin, which radiated down the posterior aspect of the leg, the doctor noted that Plaintiff was in no acute distress, there was no voluntary or involuntary guarding of the abdomen, and there was no percussion tenderness or rebound.
Plaintiff saw Dr. Flegel in August 1995. Examination revealed no evidence of palpable hernias. There was pain in Plaintiff's left lower quadrant but only upon deep palpation. A barium enema study was normal. A "scout abdomen" survey was unremarkable. An upper GI series was normal as well as a GI series of the small bowel.
Dr. Steven Archer saw Plaintiff in August 1995 for her abdominal pain and noted that his physical examination was negative. The doctor's impression was "chronic pain with questionable etiology with a long standing narcotic requirement." He referred Plaintiff to a pain clinic for evaluation.
Dr. Buckles noted in December 1995, that Plaintiff exhibited pain in the left pelvic region to palpation. No masses were evident, however. She also exhibited some lumbosacral tenderness to palpation and mild muscle spasms were present. The doctor noted that Plaintiff suffered from degenerative joint disease; however, her gait was normal, sensory exam was normal, and Plaintiff was able to heel/toe walk and she was able to squat.
As with Plaintiff's other impairments, the objective medical evidence surrounding Plaintiff's complaints of abdominal pain does not support a finding that her condition is disabling to the extent that Plaintiff cannot perform a full range of sedentary work.

4. Mental Impairment
Fourth, the objective medical evidence does not support a finding that Plaintiff suffers from a disabling mental impairment. The evidence on the record as a whole supports the ALJ's finding that her mental impairment is nonsevere and imposed, at most, only mild limitations on her ability to perform work activities. In January 1995, Dr. Yanover observed that Plaintiff's mood and spirits appeared to be normal. Plaintiff saw Dr. Abigail Moore in March 1995. Despite Plaintiff's report of symptoms including mood swings and depression, among other things, Dr. Moore's examination revealed no psychomotor agitation or retardation, good eye contact, intact thought process, good judgment and good insight. In September 1995, Plaintiff *966 told Dr. Moore that she was doing well on her current medication. Plaintiff reported then that she was "more even keeled than ever" in her life.
A mental status examination by Dr. Buckles in December 1995 found Plaintiff to be aware and alert. Her affect was normal and both recent and remote memory was intact. Plaintiff's thinking was normal and her intelligence was appropriate for her educational level.
In March 1996, despite Plaintiff's complaints, Dr. McNaul found that Plaintiff's thoughts were generally organized and goal directed. Plaintiff was alert and grossly oriented. She performed satisfactorily on tests of concentration. Although Dr. McNaul found Plaintiff to be depressed, she noted that Plaintiff's insight and judgment appeared only to be mildly impaired by her depression.
By November 1996, Plaintiff reported to Dr. McNaul that her moods were better, she liked her job, and her husband was being very supportive. The doctor observed that she was friendly and cooperative during the session, her thoughts were organized and goal directed, her affect appeared brighter, her mood was more level. Although Plaintiff's speech was a little rapid at times, it was not pressured.
In January 1997, Dr. McNaul noted that, although Plaintiff had multiple stressors in her life at the time, Plaintiff was able to smile and joke about them. The doctor observed that Plaintiff was pleasant and cooperative and she had normal speech and did not appear to be either depressed or manic.
Although Plaintiff was hospitalized for a few days in February 1997 for her mental condition, it was noted that she was discharged in a stable condition. Her goals of treatment were met during hospitalization. She benefitted significantly from her inpatient stabilization.
Dr. Russel Newton noted in October 1997 that the MMPI showed Plaintiff had a pronounced focus on physiological problems and a propensity for conversion of psychological distress into psychologic problems. He noted that Plaintiff was using somatic complaints to avoid thinking of or dealing with psychological problems. He noted that she was under acute severe situational stress. While this situational stress might cause her adjustment difficulties, this was not a disabling mental condition. He believed Plaintiff had relatively good employment potential in areas that would not exacerbate any pain problems that she was experiencing. Dr. Newton also diagnosed "malingering."
The objective medical evidence establishes that Plaintiff does not suffer from a disabling mental condition. Although Plaintiff is impaired to some degree as a result of her mental condition, she is not limited in her ability to perform a full range of sedentary work.

5. Chest Pain
Fifth, the objective medical evidence does not support a finding that Plaintiff suffers from disabling chest pain. In October 1993, when Plaintiff complained of chest pain to Dr. James, the doctor diagnosed Plaintiff with muscle strain. An echocardiogram in June 1994 showed normal heart function. A cardiac dopplar that same date was normal. An electrocardiogram in February 1994 was normal and showed no active disease. Although Plaintiff was admitted to the hospital in September 1997 with complaints of chest pain, an electrocardiogram was normal and chest x-rays at that time showed no active disease.

6. Summary
Clearly, the objective medical evidence does not support a finding that Plaintiff's impairments are so disabling to the extent that she can perform no work at all. Indeed, the objective medical evidence supports the ALJ's determination that Plaintiff has the residual functional capacity to perform a full range of sedentary work and return to her past relevant work as a receptionist.

*967 B. SUBJECTIVE COMPLAINTS OF PAIN
The issue is not whether Plaintiff experiences pain, but whether her subjective complaints are credible to the extent that they are disabling. Pickner v. Sullivan, 985 F.2d 401, 404 (8th Cir.1993). In determining that Plaintiff's subjective complaints were not credible, the ALJ properly considered Plaintiff's subjective complaints of a disabling impairment pursuant to the guidelines set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984). The ALJ expressly discredited Plaintiff's testimony and gave good reasons for doing so. Judge Ellis identified the following factors, all of which are supported by the record, which detract from the credibility of Plaintiff's subjective complaints of a disabling impairment.
First, the ALJ found that the objective medical evidence on the record as a whole did not support a finding of disability. A lack of objective medical evidence detracts from Plaintiff's subjective complaints. While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996), the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir.1991); Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir.1987).
Second, the ALJ found that Plaintiff's failure to follow prescribed treatment detracted from her credibility. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir.1989) (ALJ can discredit subjective complaints of pain based on claimant's failure to follow prescribed course of treatment); Weber v. Harris, 640 F.2d 176, 178 (8th Cir.1981).
Third, apart from Dr. McNaul's opinion, which is discussed in the subsection below, no physician determine Plaintiff to be disabled within the confines of the Social Security Act. A record which contains no physician opinion of disability detracts from claimant's subjective complaints. Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir.1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir.1981).
Fourth, the ALJ found that Plaintiff's daily activities were inconsistent with suffering from a disabling impairment. The ALJ noted that in February 1997, Plaintiff's husband stated that Plaintiff was able to "go out to church with friends and can knock on doors for hours." In August 1996, Plaintiff acknowledged that she engaged in walking, gardening and reading. In October of 1997, she said for leisure she goes on walks and reads the newspaper. She stated that she cooks a little, cleans and drives. While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with Plaintiff's subjective complaints of a disabling impairment. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir.1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir.1987). See also Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir.1992); Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir.1987).
Fifth, there is evidence that Plaintiff was working during the time period she claimed to be disabled; this detracts from her assertion that she is disabled. Where a claimant can work with an impairment, the impairment cannot be considered disabling. Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir.1990).
Sixth, the fact that Plaintiff failed to report that she was working at a job to the Social Security Administration detracts from her overall credibility. The fact that a claimant is less than candid in supplying information is a factor which discounts the claimant's credibility with respect to subjective *968 complaints. Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir.1981).
Seventh, Plaintiff's earnings record indicates a sporadic earnings history. The ALJ found this did little to enhance Plaintiff's credibility. A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. Allen v. Califano, 613 F.2d 139, 147 (6th Cir.1980). For the same reason, an ALJ may discount a claimant's credibility based upon her poor work record. Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir.1993). See also Pena v. Chater, 76 F.3d 906, 908 (8th Cir.1996); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir.1993).
Eighth, inconsistencies existed in the record which the ALJ found detracted from Plaintiff's credibility. Specifically, the ALJ said the following:
In October 1991, the claimant stated that she did not consume alcohol. However, in October 1997, the claimant stated that she had not consumed alcohol for only two years. In October 1996, the claimant again stated that she did not consume alcohol. However, in March 1995, March 1996, and March 1997, the claimant stated that she continued to consume alcohol. [citations omitted] On September 7, 1995, the claimant denied any history of opiate abuse. However, in September 1997, the claimant admitted to past abuse of heroin. [citation omitted] These statements are very inconsistent, to say the least.
(Tr. 25). If inconsistencies exist in the record, the ALJ may disbelieve the claimant's subjective testimony of disabling impairments. Aborn v. Sullivan, 959 F.2d 111, 112 (8th Cir.1992); Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir.1991); Dawson v. Bowen, 815 F.2d 1222, 1226 (8th Cir.1987).
Ninth, the ALJ found that the evidence strongly suggests that Plaintiff's complaints of pain are linked to drug seeking behavior. In addition to the quote set out in the preceding paragraph, the ALJ further stated:
Progress notes dated September 7, 1995, report that although the claimant denied a history of opiate abuse, the treating physician determined that due to the claimant's history of multi-substance abuse, her use of prescribed medications, such as Vicodin, needed to be monitored "carefully." (p. 147).
The above medical evidence strongly suggests that the claimant's complaints of pain are linked to drug seeking behavior. The presence of drug seeking behavior is consistent with her history of drug and alcohol abuse. The presence of drug seeking behavior is supported by the fact that the claimant was noted to be angry about not being able to receive "certain types of medications" in February of 1997. (p. 228). This behavior is also consistent with the fact that the medical evidence fails to establish a confirmed etiology for many of her physical complaints, and that Dr. Archer diagnosed chronic pain of an unknown etiology with a "longstanding narcotic requirement." (p. 142).
(Tr. 25). Certainly, the ALJ was permitted to rely upon this as a reason to discredit Plaintiff's testimony.
Tenth, the ALJ found Plaintiff's "bogus" claims that the previous ALJ was "unfair and made false statements" detracted from Plaintiff's credibility. The ALJ found the previous ALJ's findings to be supported by the record and Plaintiff was less than credible when she attacked the ALJ for those findings.
For the above ten reasons, the ALJ found Plaintiff's subjective complaints to be not entirely credible. The ALJ did not find that Plaintiff was not impaired at all. Instead, the ALJ found that Plaintiff's impairments were not as severe as she alleged. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir.1991). The ALJ's credibility findings must be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Hutsell v. Sullivan, 892 F.2d 747, 750 (8th *969 Cir.1989); Sykes v. Bowen, 854 F.2d 284, 287 (8th Cir.1988). The Court finds the reasons offered by the ALJ in support of his credibility determination to be based on substantial evidence. Therefore, the findings of the ALJ must be affirmed.

C. DR. McNAUL'S OPINION
Plaintiff's sole argument before this Court is that the ALJ erred in discrediting Dr. McNaul's opinion that Plaintiff was disabled. It is true that the opinions and findings of the plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Turpin v. Bowen, 813 F.2d 165, 170-71 (8th Cir. 1987); King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir.1989) (these opinions are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data); Landsaw v. Secretary of Health & Human Services, 803 F.2d 211, 213 (6th Cir.1986); Houston v. Secretary of Health & Human Services, 736 F.2d 365, 367 (6th Cir.1984). Where diagnoses are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir.1987).
The ALJ discredited Dr. McNaul's opinion for the following reasons:
However, with regards to the medical assessments and the global assessments of functioning by Dr. McNaul and Dr. Genovese, the substantial evidence indicates that Dr. McNaul's findings were chiefly based upon the claimant's complaints, as well as that the claimant's mental health related symptoms are controllable through compliance with prescribed treatment. This is evinced [sic] by the fact that when referring to medical and clinical findings supporting her medical assessment, Dr. McNaul twice cited symptoms using the introduction of "Ms. Kovacs reports...." Dr. McNaul introduced symptoms by noting that "She states...." Dr. McNaul did not cite specific clinical observations.
Further, during initial evaluation in March of 1996, the mental status examination by Dr. McNaul revealed the claimant's thoughts to be organized and goal directed. She denied psychotic symptoms. She was alert and grossly oriented. She performed satisfactorily on concentration tests. Her insight and judgement appeared only mildly impaired. Her intellectual functioning was above average, and she could provide an abstract interpretation. Moreover, the claimant was only mildly hypomanic in June 1996, and only mildly depressed in July of 1996. [citation omitted]
Further, although Dr. McNaul reported complaints of confusion, "fits of hysteria," poor sleep, panic attacks, and variable moods on November 21, 1996; progress notes dated November 14, 1996, (just one week prior), report the claimant as friendly, cooperative, and with a brighter affect. Her moods were better and "more level." The claimant stated that her medication was helping. Although her speech was "a little rapid at times" it was not pressured. Her thoughts were organized and goal directed. ... On January 16, 1997, the claimant was pleasant, cooperative, and able to smile and joke. She had normal speech which did not indicate depression or mania. Her bipolar disorder was found to be "doing relatively well despite multiple stressors." [citation omitted]
Moreover, the claimant's condition significantly improved through hospitalization in February 1997, and she was released in only three days. There is not any persuasive medical evidence of further medical mental health treatment received by the claimant on a regular *970 basis since hospitalization in February 1997.
It is also significant that although she previously stated in February of 1997 that her most recent psychiatric hospitalization was when she was twenty-nine, she stated to Dr. Newton that she was hospitalized for psychiatric reasons in 1992. [citation omitted] The medical evidence does not establish that the claimant was hospitalized for mental health reasons in 1992.
Finally, it is again noted that medical findings and observations regarding treatment and examination from March 1995 through February 1996, indicated symptoms were controlled through treatment. Thus, in light of these many facts, observations, statements, and diagnoses, the above noted global assessments of functioning and medical assessments by Dr. Genovese and Dr. McNaul are given little weight. The medical evidence, including observations and statements, establish that the claimant's symptoms are controllable through strict compliance with prescribed treatment.
(Tr. 17-18).
The undersigned finds that the ALJ properly discounted Dr. McNaul's report wherein she indicates that Plaintiff was disabled. Houston, 736 F.2d at 367; Landsaw, 803 F.2d at 213. See also King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984) (the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). The ALJ has identified numerous reasons for not accepting Dr. McNaul's opinion, all of which the Court finds to be supported by the record.

D. PAST RELEVANT WORK
If the ALJ finds that Plaintiff can return to her past relevant work, then the ALJ must determine that Plaintiff is not disabled. Wingert v. Bowen, 894 F.2d 296 (8th Cir.1990) (if the ALJ finds, based on the record as a whole, that the claimant can return to her past relevant work, the burden never shifts to the Secretary and a finding of not disabled is required); Chandler v. Secretary of Health & Human Services, 722 F.2d 369, 371 (8th Cir.1983) (if the ALJ found that Plaintiff was able to return to his past relevant work, then the ALJ had to render a finding that Plaintiff was not disabled).
Here, the ALJ concluded that Plaintiff's residual functional capacity of being able to perform a wide range of sedentary work, did not preclude her from returning to her past relevant work as a receptionist. The ALJ's decisions that Plaintiff had the residual functional capacity to perform a full range sedentary work and that she could return to her past relevant work are both supported by substantial evidence on the record as a whole. Thus, the ALJ necessarily had to find that Plaintiff was not disabled.

VIII.

CONCLUSION
The Court finds that the Commissioner's decision is supported by substantial evidence contained in the record as a whole. Thus, the Commissioner's decision should be affirmed.
Accordingly,
IT IS HEREBY ORDERED that the relief sought by Plaintiff in her Brief in Support of Complaint is DENIED. [26]
IT IS FURTHER ORDERED that the relief sought by Defendant in his Brief in Support of Answer is GRANTED. [31]
IT IS FINALLY ORDERED that a separate judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action.